UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
MARGARET ALFANO, on behalf of herself and all   :
others similarly situated, and SHAAN KASTUAR,    :
individually,    :
    :
             Plaintiffs,    :     18-cv-02558-LTS-OTW
    :
       -against-    :
    :
ZOCDOC, INC.,    :
    :
          Defendant.    :
---------------------------------------------------------------- x

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE CERTIFICATION AND COURT-AUTHORIZED NOTICE PURSUANT TO SECTION 216(b) OF THE FLSA

Dated:  New York, New York
       June 29, 2018

William F. Birchfield
Evan B. Citron
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C
599 Lexington Avenue, 17th Floor
New York, New York 10022
(212) 492-2500

*Attorneys for Defendant*
*Zocdoc, Inc.*

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND............................................ 2

    A.   ZOCDOC'S BUSINESS……………………………………………….........2

        1.   Pre-Sale Employees ........................................................ 2

        2.   Post-Sale Employees........................................................ 5

        3.   Sales Territories ............................................................. 6

        4.   Sales Teams .................................................................. 7

    B.   THE PROPOSED COLLECTIVE……………………………………………... 8

III. ARGUMENT................................................................................................... 9

    A.   THE CONDITIONAL CERTIFICATION STANDARD………………………..9

    B.   PLAINTIFFS FAIL TO SHOW THAT THEY ARE SIMILARLY SITUATED
        TO THE MEMBERS OF THE PROPOSED COLLECTIVE………………….. 10

        1.   Plaintiffs Fail to Show That They and the Proposed Collective Were Victims of
            an Unlawful Institution-Wide Policy or Practice................................................. 10

        2.   The Members of the Proposed Collective Are Not Similarly Situated Because They
            Performed Different Job Functions, Received Different Compensation Structures,
            and Were Subject to Different FLSA Exemptions ............................................... 14

    C.   THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR EQUITABLE
        TOLLING……………………………………………………………………… 21

    D.   SHOULD THE COURT GRANT CONDITIONAL CERTIFICATION,
        PLAINTIFFS' PROPOSED NOTICE SHOULD BE REJECTED…………….   23

    E.   SHOULD THE COURT GRANT CONDITIONAL  CERTIFICATION,
        PLAINTIFFS' REQUEST FOR  EMPLOYEES' TELEPHONE NUMBERS
        SHOULD BE REJECTED……………………………………………………….   24

IV.  CONCLUSION.............................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Inter-Con Sec. Sys., Inc.*,
  242 F.R.D. 530 (N.D. Cal. 2007) ............................................................................13

*Barfield v. New York City Health & Hosps. Corp.*,
  2005 WL 3098730 (S.D.N.Y. Nov. 17, 2005) ....................................................9, 10

*Bearden v. AAA Auto Club S., Inc.*,
  2013 WL 1181474 (W.D. Tenn. Mar. 18, 2013) .............................................15, 19

*Calderon v. King Umberto, Inc.*,
  892 F. Supp. 2d 456 (E.D.N.Y. Sept. 25, 2012) ....................................................24

*Callari v. Blackman Plumbing Supply, Inc.*,
  307 F.R.D. 67 (E.D.N.Y. 2015) ...........................................................15, 18, 19

*Carruthers v. The Keisch Sch.*,
  2010 WL 5055876 (M.D. Fla. Dec. 3, 2010) .........................................................15

*A.Q.C. ex rel. Castillo v. United States*,
  656 F.3d 135 (2d Cir. 2011) ...................................................................................21

*Castle v. Wells FargoFin., Inc.*,
  2008 WL 495705 (N.D. Cal. Feb. 20, 2008) .........................................................12

*Colson v. Avnet, Inc.*,
  687 F. Supp. 2d 914 (D. Ariz. 2010) .....................................................................11

*D'Anna v. M/A-COM, Inc.*,
  903 F. Supp. 889 (D. Md. 1995) ............................................................................10

*Diaz v. Electronics Boutique of Am., Inc.*,
  2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ......................................................18

*Diaz v. S&H Bondi's Dept. Store*,
  2012 WL 137460 (S.D.N.Y. Jan. 18, 2012) ..........................................................24

*Evancho v. Sanofi-Aventis U.S., Inc.*,
  2007 WL 4546100 (D.N.J Dec. 19, 2007) .............................................................21

*Fasanelli v. Heartland Brewery, Inc.*,
  516 F. Supp. 2d 317 (S.D.N.Y. 2007) ....................................................................25

*Fengler v. Crouse Health Found., Inc.*,
595 F. Supp. 2d 189 (N.D.N.Y. 2009) ............................................................................23, 25

*Francis v. A&E Stores, Inc.*,
No. 06 Civ. 1638, 2008 U.S. Dist. LEXIS 49971 (S.D.N.Y. Jun. 26, 2008)..........................25

*Fu v. Mee May Corp.*,
2016 WL 1588132 (S.D.N.Y. April 20, 2016) .........................................................................9

*Gordon v. Kaleida Health*,
2009 WL 3334784 (W.D.N.Y. Oct. 14, 2009) .......................................................................25

*Guillen v. Marshalls of MA, Inc.*,
2012 WL 2588771 (S.DN.Y. July 2, 2012) ...............................................................11, 13, 21

*Guzelgurgenli v. Prime Time Specials Inc.*,
883 F. Supp. 2d 340 (E.D.N.Y. 2012) ...................................................................................24

*Han v. Sterling Nat'l Mortg. Co.*,
2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011) .......................................................................25

*Hendricks v. JPMorgan Chase Bank, N.A.*,
263 F.R.D. 78 (D. Conn. 2009)...............................................................................................18

*Hernandez v. Immortal Rise, Inc.*,
2012 WL 4369746 (E.D.N.Y. Sept. 24, 2012) .......................................................................24

*Irwin v. Dep't of Veterans Affairs*,
498 U.S. 89 (1990)...................................................................................................................21

*Jackson v. Bloomberg, L.P.*,
298 F.R.D. 152 (S.D.N.Y. 2014) ......................................................................................21, 22

*Jungkunz v. Schaeffer's Inv. Research, Inc.*,
2014 WL 1302553 (S.D. Ohio Mar. 31, 2014).......................................................................12

*Kassman v. KPMG LLP*,
2015 WL 5178400 (S.D.N.Y. Sept. 4, 2015), reconsideration denied, 2015
WL 5775866 (S.D.N.Y. Oct. 2, 2015) ....................................................................................22

*Khan v. Airport Mgmt. Servs., LLC*,
2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011) ...................................................................9, 10

*Limarvin v. Edo Rest. Corp.*,
2013 WL 371571 (S.D.N.Y. Jan. 31, 2013) ...........................................................................24

*Litty v. Merrill Lynch & Co.*,
2015 WL 4698475 (C.D. Cal. Apr. 27, 2015) ..................................................................12, 15

*Mendoza v. Ashiya Sushi 5, Inc.*,
   2013 WL 5211839 (S.D.N.Y. Sept. 16, 2013).......................................................................23

*Mercado v. Sandoval, Inc.*,
   2009 WL 2031715 (E.D. Cal. July 9, 2009) ...............................................................12, 14

*Mike v. Safeco Ins. Co. of Am.*,
   274 F. Supp. 2d 216 (D. Conn. 2003)...........................................................................10, 13

*Moore v. Eagle Sanitation, Inc.*,
   276 F.R.D. 54 (E.D.N.Y. 2011) .............................................................................................24

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
   111 F. Supp. 2d 493 (D.N.J. 2000) .......................................................................................13

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)..............................................................................................9, 15

*Parker v. NutriSystem, Inc.*,
   620 F.3d 274 (3d Cir. 2010)..................................................................................................19

*Ramos v. Platt*,
   2014 WL 3639194 (S.D.N.Y. July 23, 2014) ........................................................................23

*Reed v. Mobile County Sch. Sys.*,
   246 F. Supp. 2d 1227 (S.D. Ala. 2003).................................................................................9

*Sexton v. Franklin First Fin., Ltd.*,
   2009 WL 1706535 (E.D.N.Y. June 16, 2009) .....................................................................14

*Sheffield v. Orius Corp.*,
   211 F.R.D. 411 (D. Or. 2002) ...............................................................................................18

*Tamay v. Mr. Kabob Rest., Inc.*,
   2016 WL 205456 (S.D.N.Y. Jan. 15, 2016) .........................................................................23

*Thompson v. Speedway SuperAmerica LLC*,
   2009 WL 130069 (D. Minn. Jan 20, 2009).............................................................................12

*Trinh v. J.P. Morgan Chase & Co.*,
   2008 WL 1860161 (S.D. Cal. Apr. 22, 2008)................................................................12, 15

*Vasquez v. Vitamin Shoppe Indus., Inc.*,
   2011 WL 2693712 (S.D.N.Y. July 11, 2011) .......................................................................11

*Vasto v. Credico (USA) LLC*,
   2016 WL 2658172 (S.D.N.Y. May 5, 2016) .........................................................................22

*Zerilli-Edelglass v. N.Y.C. Transit Auth.*,
    333 F.3d 74 (2d Cir. 2003)..................................................................................22

**Federal Statutes**

29 U.S.C. § 207(i)..................................................................................................19

29 U.S.C. § 213(a)(1)............................................................................................21

29 U.S.C. § 256..................................................................................................21, 22

**Regulations**

29 C.F.R. § 541.201............................................................................................20

29 C.F.R. § 541.601............................................................................................20

Defendant Zocdoc, Inc. ("Zocdoc") respectfully submits this memorandum of law in opposition to Plaintiffs' Motion for Conditional Collective Certification and Court-Authorized Notice Pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA") (the "Motion") (Docket No. 70).

## I.    PRELIMINARY STATEMENT

Plaintiffs seek to bring an action on behalf of a collective of individuals who worked in Zocdoc's New York City offices and held any of nine different Zocdoc sales positions during an eight-month period, claiming failure to pay overtime.  Glossing over the significant differences in job duties and compensation structure across those nine positions, and ignoring the lack of any single Zocdoc decision or policy that violated the FLSA, Plaintiffs rest their argument on the "minimal burden" they claim governs their application.  Plaintiffs' repeated incantation of that standard, however, cannot obscure their failure to furnish the competent evidence required to carry it.

In support of their deficient application, Plaintiffs submit Declarations alleging that they and other employees who held one or more of the nine different sales positions frequently worked over forty hours a week.  No Plaintiff, however, can cite any Zocdoc policy that actually required them to do so.  Nor can Plaintiffs mask the variance in job duties, compensation structures, and FLSA exemptions applicable to the nine positions they seek to brand as one.  As demonstrated below, Plaintiffs' failure to identify any common policy, plan, or scheme in violation of the FLSA, and inability to establish that they are similarly situated to the members of the Proposed Collective, necessitates the denial of their Motion here.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   ZOCDOC'S BUSINESS

Zocdoc is an online medical care appointment booking service that provides patients with the ability to, *inter alia*, find and schedule appointments with in-network health care providers. (Declaration of Evan Bartlett ("Bartlett Dec."), ¶ 2; Declaration of Peter Schlendorf ("Schlendorf Dec."), ¶ 2.) Zocdoc's services are free of charge for patients, while providers pay subscription fees to be included on Zocdoc's online platform. (Bartlett Dec., ¶ 2; Schlendorf Dec., ¶ 2.) Zocdoc maintains United States offices in Scottsdale, Arizona and New York, New York (the "NY Office"). (Bartlett Dec., ¶ 3; Schlendorf Dec., ¶ 3.) Zocdoc employed a staff of NY Office pre-sale employees and post-sale employees, among others, that Plaintiffs seek to include in the Proposed Collective. (Bartlett Dec., ¶ 9; Schlendorf Dec., ¶ 8.)

During the relevant period, Zocdoc sold subscription plans to providers and practices that included marketing, promotion, and advertising services. (Bartlett Dec., ¶ 7; Schlendorf Dec., ¶ 6.)[1] Zocdoc's sales employees included, among other positions, employees responsible for communicating with providers prior to their purchase of Zocdoc services ("Pre-Sale Employees"), and (ii) employees responsible for communicating with providers subsequent to their purchase of Zocdoc services ("Post-Sale Employees"). (Bartlett Dec., ¶ 9; Schlendorf Dec., ¶ 8.) During the relevant time period, Plaintiffs seek to include NY Office Pre-Sale Employees and Post-Sale Employees in the Proposed Collective. (Docket No. 54 ("Br.") at 1.)

### 1.   *Pre-Sale Employees*

Zocdoc's Pre-Sale Employees included Sales Origination Associates (formerly called Business Origination Associates) ("SOAs"), Inside Sales Executives ("ISEs"), Sales Associates

---

[1] Zocdoc is not a software company. (Schlendorf Dec., ¶ 7.) It does not and never has sold hosted software. (Bartlett Dec., ¶ 8; Schlendorf Dec., ¶ 7.)

("SAs"), New Market Sales Representatives ("NMSRs"), and Sales Executives ("SEs").  (Bartlett Dec., ¶ 10; Schlendorf Dec., ¶ 9.)   Each of these positions entailed different duties and compensation structures.  (Bartlett Dec., ¶ 10; Schlendorf Dec., ¶ 9.)

### a.   SOAs

SOAs were junior-level employees responsible for "cold-calling" potential customers to schedule meetings between the potential customers and ISEs and SAs.  (Bartlett Dec., ¶ 11; Schlendorf Dec., ¶ 10.)  SOAs were not involved in closing sales, and performed their duties at Zocdoc's offices.  (Bartlett Dec., ¶ 11; Schlendorf Dec., ¶ 10.)  They received a base salary and commissions based on how many meetings they were able to set up with potential customers, and the business that resulted from any such meetings.  (Bartlett Dec., ¶ 12; Schlendorf Dec., ¶ 11.)  Unlike ISEs and SAs, SOAs typically received less than 50% of their total compensation through commissions.  (Bartlett Dec., ¶ 12; Schlendorf Dec., ¶ 11.)

### b.   ISEs and SAs

ISEs and SAs were responsible for selling Zocdoc's products and services to potential customers, closing sales, assisting customers with selecting services, and partially building customer profiles.  (Bartlett Dec., ¶ 13; Schlendorf Dec., ¶ 12.)  ISEs and SAs also commonly assisted customers with their use of Zocdoc's services, and researched healthcare practices to assess their fitness for inclusion among Zocdoc's services.  (Bartlett Dec., ¶ 13; Schlendorf Dec., ¶ 12.)  ISEs and SAs received referrals from SOAs, and "cold-called" potential customers. (Bartlett Dec., ¶ 14; Schlendorf Dec., ¶ 13.)  They scheduled meetings with potential customers, and led customer meetings that SOAs scheduled.  (Bartlett Dec., ¶ 14; Schlendorf Dec., ¶ 13.)  ISEs and SAs performed certain of their duties at Zocdoc's offices, and certain of their duties away from Zocdoc's offices.  (Bartlett Dec., ¶ 14; Schlendorf Dec., ¶ 13.)

While ISEs received a base salary and commissions based on the number of sales they closed, ISEs received a higher base salary than SAs.  (Bartlett Dec., ¶ 15; Schlendorf Dec., ¶ 14.) SAs received a higher base salary than SOAs.  (Bartlett Dec., ¶ 15; Schlendorf Dec., ¶ 14.)  When meeting their on-target earnings, ISEs typically earned approximately 50% of their compensation through their base salary and 50% of their compensation through commissions.  (Bartlett Dec., ¶ 15; Schlendorf Dec., ¶ 14.)  Approximately 10-25% of ISEs earned more than 50% of their compensation through commissions.  These employees typically earned more than $100,000 per year.  (Bartlett Dec., ¶ 16; Schlendorf Dec., ¶ 15.)  Some ISEs earned more than $200,000 per year.  (Bartlett Dec., ¶ 16; Schlendorf Dec., ¶ 15.)

SAs were junior-level ISEs whose job duties and compensation structure mirrored that of ISEs.  (Bartlett Dec., ¶ 17; Schlendorf Dec., ¶ 16.)  ISEs, NMSRs and SAs received more of their total compensation through commissions than SOAs did.  (Bartlett Dec., ¶ 17; Schlendorf Dec., ¶ 16.)

### c.    SEs

SEs were responsible for outside sales, which entailed selling Zocdoc's services through visits to the offices of potential customers.  (Bartlett Dec., ¶ 18; Schlendorf Dec., ¶ 17.)  SEs regularly performed their duties away from Zocdoc's offices.  (Bartlett Dec., ¶ 18; Schlendorf Dec., ¶ 17.)  Standard SE duties included "cold calling" prospects in their assigned territory, and setting up meetings with providers or practices, building a professional profile for the provider or practice, meeting with the practice's staff, and scheduling training/onboarding of the practice to ensure a successful, long-term relationship with ZocDoc.  (Bartlett Dec., ¶ 18; Schlendorf Dec., ¶ 17.)  SEs received a base salary and commissions based on the number of sales they closed. (Bartlett Dec., ¶ 18; Schlendorf Dec., ¶ 17.)  The SE base salary was higher than the SA base salary, but lower than the ISE base salary.  (Bartlett Dec., ¶ 19; Schlendorf Dec., ¶ 17.)

### d.    NMSRs

New Market ("NM") teams consisted of inside salespersons (ISEs and SAs) who were assigned to specific territories where Zocdoc had little to no presence and/or existing clients. (Schlendorf Dec., ¶ 18.)  Since NMSRs were pioneering Zocdoc business, their commission structure varied from similar sales roles who were selling into stable, established markets. (Schlendorf Dec., ¶ 18.)  Unlike other positions which based commission solely on individual sales, NMSR compensation was a combination of a base salary and a commission based on the team's collective ability to close sales in the new market.  (Schlendorf Dec., ¶ 18.)  Additionally, New Market teams had the potential to earn a bonus for achieving collective sales goals. (Schlendorf Dec., ¶ 18.)

### 2.    *Post-Sale Employees*

Zocdoc's Post-Sale Employees included Account Development Representatives ("ADRs"), Account Managers ("AMs") and Account Associates ("AAs").  (Schlendorf Dec., ¶ 21.)

### a.    ADRs

ADRs were post-sale employees who were responsible for contacting existing Zocdoc customers to generate additional business, such as upgrading customers on monthly contracts to yearly contracts, and enrolling additional doctors from a practice to join Zocdoc.  (Schlendorf Dec., ¶ 22.)  ADRs received a base salary and commissions based on a percentage of the additional business they generated from existing customers.  (Schlendorf Dec., ¶ 22.)

### b.    AMs

AMs were responsible for maintaining Zocdoc's existing customer relationships and preventing customer attrition via, *inter alia*, providing expert advice and assistance to customers regarding Zocdoc's services.  (Schlendorf Dec., ¶ 23.)  AMs' main role did not entail selling

Zocdoc's products and services to existing customers.  (Schlendorf Dec., ¶ 23.)  AMs received salaries and commissions based on (i) the number of customers retained within a given month, and (ii) their overall retention rate.  (Schlendorf Dec., ¶ 23.)

### c.   AAs

AAs managed customer relationships, with an emphasis on preventing accounts from cancelling and renewing practice subscriptions.  (Schlendorf Dec., ¶ 24.)  AAs received a base salary and commissions based on the number of doctors they retained from leaving the service.  (Schlendorf Dec., ¶ 24.)  Typically, AAs were recruited from strong performing Zocdoc employees who were recommended by their current manager.  (Schlendorf Dec., ¶ 24.)  AAs who met their on-target earnings typically earned compensation through their base salary and less than 50% of their compensation through commissions.  (Schlendorf Dec., ¶ 24.)

### 3.   *Sales Territories*

At certain times, the calculation of a sales employee's commissions was based not only on that employee's position, but also on his or her assigned sales territory.  (Schlendorf Dec., ¶ 25.)  Zocdoc occasionally factored an employee's territory into his or her commission calculation because closing business proved more challenging in some territories than in others.  (Schlendorf Dec., ¶ 25.)  Accordingly, sales employees who worked in more challenging territories occasionally received higher commissions on a per doctor basis than employees who worked in less challenging territories.  (Schlendorf Dec., ¶ 25.)  Additionally, employees' work schedules may be adjusted by their manager depending on the assigned sales territory (*e.g.*, managers frequently permitted sales employees to arrive an hour later or an hour earlier corresponding to the business hours of their teams' assigned territory).  (Bartlett Dec., ¶ 27; Schlendorf Dec., ¶ 26.)[2]

---

[2] As sales employee shifts were frequently scheduled or altered based on regional time zones and targets, employees did not uniformly work from 9:00 a.m. to 5:00 p.m.  (Schlendorf Dec., ¶ 26.)

### 4.    *Sales Teams*

Zocdoc's sales employees performed their duties as part of teams. (Bartlett Dec., ¶ 21; Schlendorf Dec., ¶ 27.) While SOAs were generally assigned to teams of fifteen to twenty employees, Zocdoc's other sales employees were assigned to teams of five to twenty employees. (Bartlett Dec., ¶ 21; Schlendorf Dec., ¶ 27.) Zocdoc assigned a supervisor to each team, and each supervisor possessed a significant degree of autonomy to set the team's goals, rules, and regular work hours. (Bartlett Dec., ¶ 21; Schlendorf Dec., ¶ 27.) Team goals, rules, and regular work hours thus varied greatly depending on the team's supervisor. (Bartlett Dec., ¶ 21; Schlendorf Dec., ¶ 27.) No supervisor, however, instituted a rule or schedule that required employees to work more than forty hours per week. (Schlendorf Dec., ¶ 27.) Nor did any Zocdoc policy require employees to work more than forty hours per week, or indirectly compel that result. (Bartlett Dec., ¶ 21; Schlendorf Dec., ¶ 27.) All sales goals set by Zocdoc could have been met within a forty-hour week. (Schlendorf Dec., ¶ 28.) Indeed, many of the employees who met their sales goals did so within a forty-hour week, and some top performers were able to exceed their goals while working less than forty hours per week.[3] (Bartlett Dec., ¶ 22; Schlendorf Dec., ¶ 28.) The hours that employees worked, along with a broad range of relevant sales data, including client leads, performance metrics, and employees' daily activities, were reflected in SalesForce, a customer relationship management platform that sales teams used to track key data and maximize performance. (Schlendorf Dec., ¶ 29.)

While employees in the NY Office were not required to work more than forty hours per week, some sales employees elected to do so to earn higher commissions. (Bartlett Dec., ¶ 23;

---

[3] In November 2015, Zocdoc instituted a policy that requires certain sales employees to obtain advanced approval prior to working more than forty hours per week. (Bartlett Dec., ¶ 22 n.1.)

Schlendorf Dec., ¶ 30.)  Those employees usually produced more and typically earned well in excess of $100,000 per year in total compensation.  (Bartlett Dec., ¶ 23; Schlendorf Dec., ¶ 30.)  The vast majority of sales employees, however, did not work later than 6:00 p.m.  (Bartlett Dec., ¶ 26.)  Those individuals who regularly worked later than 6:00 p.m. typically earned more than $100,000 in total compensation, or were responsible for a territory in the western United States, and thus began working later in the day than those responsible for territories in the eastern United States.  (Bartlett Dec., ¶ 26.)

Zocdoc provided all employees with a catered lunch every Monday through Friday, except for holidays.  (Bartlett Dec., ¶ 24; Schlendorf Dec., ¶ 31.)  Prior to November 2015, Zocdoc's sales employees took lunch breaks of thirty minutes to one hour for lunch every day.  (Bartlett Dec., ¶ 24; Schlendorf Dec., ¶ 31.)  Additionally, Zocdoc has a fun room in the NY Office that includes free snacks, ping pong tables and arcade games.  (Bartlett Dec., ¶ 25; Schlendorf Dec., ¶ 32.)  Zocdoc's sales employees frequently took breaks during the day to enjoy these amenities, in addition to their lunch breaks. (Bartlett Dec., ¶ 25; Schlendorf Dec., ¶ 32.)

## B.     THE PROPOSED COLLECTIVE

At this time, approximately 36 former employees have submitted consent filings to join this action.  These former employees previously held various positions with Zocdoc, including AA, AM, ISE, NMSR SA, SE, SOA.  *See generally* Docket Nos. 53-1 – 53-14.  While some of those positions involved pre-sale duties, such as contacting potential customers and making sales, others entailed post-sale duties, such as maintaining customer relationships and preventing customer attrition.  Each of the various positions within the Proposed Collective entailed different job duties and compensation structures, were tasked with meeting different team goals, and were subject to different policies.

8

### III.   ARGUMENT

**A.   THE CONDITIONAL CERTIFICATION STANDARD**

A collective action may not be conditionally certified unless the named plaintiffs provide sufficient admissible evidence of a system-wide unlawful policy or practice to violate the FLSA, and establish the existence of "similarly-situated" individuals who wish to join the action. *Barfield v. New York City Health & Hosps. Corp.*, 2005 WL 3098730, at *3 (S.D.N.Y. Nov. 17, 2005) ("[T]o warrant certification as a collective action under § 216(b) of the FLSA, a plaintiff must make at least a modest factual showing sufficient to demonstrate that [he or she] and potential plaintiffs together were victims of a common policy or plan that violated the law.") (citations and quotations omitted); *see also Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227, 1232 (S.D. Ala. 2003) ("[T]he burden is on the plaintiffs to make an evidentiary showing that they and the proposed class are similarly situated, not on the defendants to disprove such similarity."). Therefore, a plaintiff must demonstrate that "there are other employees . . . who are similarly situated with respect to their job requirements and with regard to their pay provisions, on which the criteria for many FLSA exemptions are based, who are classified as exempt pursuant to a common policy or scheme." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (quotations omitted).

"While plaintiff's burden at this stage is modest, it is not non-existent." *Khan v. Airport Mgmt. Servs., LLC*, 2011 WL 5597371, at *16 (S.D.N.Y. Nov. 16, 2011); *see Fu v. Mee May Corp.*, 2016 WL 1588132, at *5 (S.D.N.Y. April 20, 2016) ("[C]ertification is not automatic.  This modest showing must still be based on some substance, and a plaintiff must provide some actual evidence.") (quotations omitted).  Prior to subjecting an employer and this Court to the significant and costly burdens of a collective action, Plaintiffs must make some factual showing that the claimants are similarly-situated and that questions common to a potential group of plaintiffs would

predominate, which "cannot be satisfied simply by unsupported assertions." *Khan*, 2011 WL 5597371, at *16 (citations and quotations omitted); *see also Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220-221 (D. Conn. 2003) (denying conditional certification "[b]ecause the proof in this case is specific to the individual [and] [plaintiff] ha[d] not provided evidence of a common thread binding his proposed class of employees"). The purpose of ensuring that Plaintiffs have made some evidentiary showing of a similar policy, plan, or scheme is "to avoid the stirring up of litigation through unwarranted solicitation" and unnecessarily burden an employer "by a frivolous fishing expedition conducted by plaintiff at the employer's expense." *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995) (citations and quotations omitted). Plaintiffs' failure to make that requisite showing warrants the denial of their application here.

**B.     PLAINTIFFS FAIL TO SHOW THAT THEY ARE SIMILARLY
        SITUATED TO THE MEMBERS OF THE PROPOSED COLLECTIVE**

The Motion cannot lie because Plaintiffs fail to carry their burden of proffering competent evidence that they are "similarly situated" to the Proposed Collective with respect to their misclassification and overtime claims. First, Plaintiffs fail to furnish any evidence, let alone competent evidence, of a common policy or plan that violated the law. Second, Plaintiffs do not and cannot establish that they are similarly situated to the members of the Proposed Collective because those members (i) did not perform the same job functions, (ii) possessed different compensation structures, and (iii) were subject to different FLSA exemptions.

**1.     Plaintiffs Fail to Show That They and the Proposed Collective
        Were Victims of an Unlawful Institution-Wide Policy or Practice**

To certify a collective action, a plaintiff must show that the employer implemented a single decision, policy, or plan that violates the FLSA. *See, e.g., Barfield*, 2005 WL 3098730, at *3; *see Guillen v. Marshalls of MA, Inc.*, 2012 WL 2588771, at *1 (S.D.N.Y. July 2, 2012) ("[A]n FLSA plaintiff must . . . allege some identifiable factual nexus which binds the named plaintiffs and

10

potential class members together as victims of a particular practice").  "The mere classification of a group of employees – even a large or nationwide group – as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for §216(b) purposes."  *Vasquez v. Vitamin Shoppe Indus., Inc.*, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011); *see also Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 927 (D. Ariz. 2010) (noting that the "mere classification of a group of employees as exempt does not automatically dictate, as a matter of law, whether collective action notification is appropriate") (citing *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009)).  Indeed, "courts in this Circuit have routinely held that the mere fact of a common FLSA-exempt designation, job description, or uniform training is insufficient to find [potential class members] similarly situated for FLSA purposes."  *Guillen*, 2012 WL 2588771, at *1.

*Colson* is particularly instructive.  In *Colson*, the plaintiff brought an FLSA claim against her employer, claiming that the employer had misclassified sales and marketing representatives ("SMRs") as exempt employees under the FLSA.  *Id.* at 917.  The plaintiff sought to certify a nation-wide collective of all SMRs and other allegedly misclassified employees who performed substantially the same job duties as SMRs.  *Id.*  In support of her motion for conditional certification, the plaintiff submitted declarations stating that employer had wrongfully misclassified the plaintiff and other employees as "exempt" for purposes of the FLSA.  *Id.*  The court denied that application for the plaintiff's failure to establish that she and the Proposed Collective were subject to an unlawful policy.  In explaining its reasoning, the court noted that "the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy,

11

plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Id.* at 927.  Indeed, "[i]f it were, in every instance where an employer is accused of misclassifying a large group of employees, the district court would then somehow be required to order collective action notification, irrespective of the quality or quantity of evidence that had been produced" in support thereof." *Id.  See also Litty v. Merrill Lynch & Co.*, 2015 WL 4698475, at *7 (C.D. Cal. Apr. 27, 2015) (denying conditional certification and noting that "merely alleging that a class of employees was wrongly designated 'exempt' does not constitute a showing of an unlawful, institution-wide policy").  Other courts have similarly denied motions for conditional certification where plaintiffs have alleged only that that the defendant-employers had failed to compensate employees with premium overtime pay.  *See, e.g., Jungkunz v. Schaeffer's Inv. Research, Inc.*, 2014 WL 1302553, at *11–12 (S.D. Ohio Mar. 31, 2014) (denying conditional certification where the plaintiff failed to provide support for the allegation that the alleged FLSA violations were the product of a company policy); *Mercado v. Sandoval, Inc.*, 2009 WL 2031715, at * 1 (E.D. Cal. July 9, 2009) (denying conditional certification where the plaintiffs "failed to clearly identify an illegal FLSA policy in their opening brief."); *Thompson v. Speedway SuperAmerica LLC*, 2009 WL 130069, at *2 (D. Minn. Jan 20, 2009) ("A plaintiff who seeks conditional certification of a collective action against an employer must do more than show that some employees were paid less than the FLSA required."); *Castle v. Wells FargoFin., Inc.*, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) ("[P]laintiffs have not identified any company-wide policy or practice to deny overtime and thus have failed to show that the various … employees are similarly situated for purposes of class certification."); *Trinh v. J.P. Morgan Chase & Co.*, 2008 WL 1860161, *4 n.2 (S.D. Cal. Apr. 22, 2008) ("Because Plaintiffs' only allegation that Defendants engaged in a wrongful policy is that Defendants uniformly classified Plaintiffs . . . as

'exempt,' the Court follows *Morisky* and other courts in finding that Plaintiffs have failed to make substantial allegations identifying an unlawful nationwide policy"); *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 536 (N.D. Cal. 2007) (noting that plaintiffs must "make substantial allegations that the putative class members were subject to a single illegal policy, plan, or decision"); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220-221 (D. Conn. 2003) (rejecting plaintiff's argument that defendant's characterization of employees as exempt under the FLSA sufficiently establishes that these employees are similarly situated for purposes of conditional certification); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (denying conditional certification where common scheme alleged by plaintiff involved nothing more than defendant's decision to classify plaintiffs as exempt); *see also Guillen*, 2012 WL 258871, at *1 (collecting cases in support of the rule that "the mere fact of a common FLSA-exempt designation, job description, or uniform training is insufficient to find [a putative class] similarly situated for FLSA purposes").

Plaintiffs' claims are similarly defective because they cannot cite any unlawful company policy. While Plaintiffs' lockstep declarations allege that they "regularly worked" over forty hours per week, Plaintiffs do not allege that Zocdoc ever required them to do so. *See generally* Docket Nos. 53-1 – 53-14. Nor do Plaintiffs allege that Zocdoc had any company policy that resulted in them having to work more than forty hours per week, or otherwise violated the FLSA. Nor could they, as no such policy existed. (Bartlett Dec., ¶ 21; Schlendorf Dec., ¶ 27.) Indeed, Zocdoc created goals for its sales employees that could be met, were met, and often *exceeded* within a forty-hour work week. (Bartlett Dec., ¶ 22; Schlendorf Dec., ¶ 28 .)

Unable to show that the Proposed Collective members were subjected to any single policy with respect to work hours, Plaintiffs resort to alleging, in wholly conclusory fashion, that

"Zocdoc's company-wide policies on the monthly goals that the ISRs had to obtain were not possible to achieve in a 40 hour workweek." *See, e.g.*, Docket No. 53-4, at ¶ 10.  But Plaintiffs fail to identify any "policies" to substantiate that specious claim.  Plaintiffs' further claim that "Zocdoc also had other company-wide policies to make its ISRs work over 40 hours per workweek" (*see, e.g.*, Docket No. 53-5 at ¶ 14) is equally unavailing.  In support of that baseless contention, Plaintiffs offer only that (i) "ISRs often had to attend 7:30 a.m. meetings at the office with their managers"; (ii) "if you worked from Zocdoc's office past approximately 6 p.m. dinners were provided via seamless.com"; and (iii) "Zocdoc paid for a car service home 'if you stay late.'" (*See, e.g., id.*)  None of these constitute or are even remotely suggestive of an unlawful policy or practice.  Plaintiffs' failure to carry their burden of proffering evidence of such dooms their application here.  *See, e.g.*, *Mercado*, 2009 WL 2031715, at * 1 (denying conditional certification where the plaintiffs "failed to clearly identify an illegal FLSA policy"); *Cf. Sexton v. Franklin First Fin., Ltd.*, 2009 WL 1706535, at *4 (E.D.N.Y. June 16, 2009) (granting conditional certification where loan officers claimed they were subjected to a uniform policy and practice of being required to work more than forty hours per week without overtime pay).

   2.    **The Members of the Proposed Collective Are Not Similarly Situated Because They Performed Different Job Functions, Received Different Compensation Structures, and Were Subject to Different FLSA Exemptions**

        a.    **The Members of the Proposed Collective Performed Different Job Functions and Were Compensated Differently**

Plaintiffs attempt to sidestep material differences in the duties and compensation structures throughout the Proposed Collective by insisting that they "all performed the same primary job duties" and "were all paid a salary and commissions based on a quota system."  (Br. at 1.)  The record evidence, though, makes plain that there were significant differences between the nine different positions that Plaintiffs seek to cast as one.  The variance in job duties and compensation

structure from one position to another forecloses any showing that Plaintiffs were similarly situated to the Proposed Collective here.

"When the ultimate issue of whether each employee was properly classified under the FLSA, the 'similarly situated' inquiry must be analyzed in terms of the nature of each putative plaintiff's job duties." *Trinh*, 2008 WL 1860161, at *4. To carry their burden, Plaintiffs must show that they and the Proposed Collective members of the Proposed Collective are "similarly situated with respect to their job requirements and to their pay provisions." *Myers*, 624 F.3d at 555. Plaintiffs cannot satisfy that burden where the Proposed Collective members perform a variety of different job functions. *See e.g., Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 81–82 (E.D.N.Y. 2015), reconsideration denied, 153 F. Supp. 3d 590 (E.D.N.Y. 2015) (denying conditional certification for assistant branch managers and inside sales representatives where there were differences between their respective job functions); *Bearden v. AAA Auto Club S., Inc.*, 2013 WL 1181474, at *8 (W.D. Tenn. Mar. 18, 2013) (denying conditional certification where some inside sales representatives made inside sales calls and outside sales visits, while others made only inside sales calls); *see also Carruthers v. The Keisch Sch.*, 2010 WL 5055876, at *2 (M.D. Fla. Dec. 3, 2010) ("To conclude that an employee may establish the 'similarly situated' requirement simply by claiming violations of the law by the same employer, would be to conclude that any time employees alleged unpaid overtime due from the same employer, such employees would be 'similarly situated.'") (citation omitted).

When determining whether employees are "similarly situated" in terms of job duties, courts will consider factors such as the job duties actually performed on a daily basis, the importance of the job duties performed, pay provisions, and whether any of the FLSA's exemptions might apply to members of the Proposed Collective. *See, e.g., Litty*, 2015 WL 4698475, at *7. Those factors

all militate against certification here. Indeed, Plaintiffs are not similarly situated to the Proposed

Collective because the positions among that group all entail different job requirements, duties, and

pay provisions.

Most significant of the numerous differences among the group is that certain positions

performed only pre-sale duties, while others performed only post-sale duties. Specifically, SOAs,

SAs, ISEs, NMSRs, and SEs all performed pre-sale duties. While each of those positions' duties

included contacting prospective customers, there was considerable variance in the manner of such

communications, and certain other responsibilities:

- SOAs were junior-level employees responsible for "cold-calling" potential customers to schedule meetings between the potential customers and ISEs and SAs. SOAs were not involved in closing sales, and performed their duties at Zocdoc's offices. (Bartlett Dec., ¶ 11; Schlendorf Dec., ¶ 10.)

- ISEs and SAs were responsible for selling Zocdoc's products and services to potential customers, closing sales, assisting customers with selecting services, and partially building customer profiles. These positions received referrals from SOAs and "cold-called" potential customers. ISEs and SAs performed certain of their duties at Zocdoc's offices, and certain of their duties away from Zocdoc's offices. (Bartlett Dec., ¶¶ 13-14; Schlendorf Dec., ¶¶ 12-13.)

- SEs were responsible for outside sales, which entailed selling Zocdoc's services through visits to the offices of potential customers. SEs regularly performed their duties away from Zocdoc's offices. Standard SE duties included "cold calling" prospects in their assigned territory, and setting up meetings with providers or practices, building a professional profile for the provider or practice, meeting with the practice's staff, and scheduling training/onboarding of the practice to ensure a successful, long-term relationship with Zocdoc. (Bartlett Dec., ¶ 18; Schlendorf Dec., ¶ 17.)

- Each Pre-Sale Employee position also reflected a combination of employee ambition, qualifications, and skills. For instance, employees who were successful in sales but demonstrated less customer service and/or client relationship-building skills might ascend to ISE rather than AM. (Bartlett Dec., ¶ 20; Schlendorf Dec., ¶ 20.)

There was also significant variance among the Pre-Sale Employees' compensation

structures:

16

- SOAs received a base salary and commissions based on how many meetings they were able to set up with potential customers, and the business that resulted from any such meetings. Unlike ISEs and SAs, SOAs typically received less than 50% of their total compensation through commissions. (Bartlett Dec., ¶ 12; Schlendorf Dec., ¶ 11.)

- ISEs received a base salary and commissions based on the number of sales they closed. When meeting their on-target earnings, ISEs typically earned approximately 50% of their compensation through their base salary and 50% of their compensation through commissions. Approximately 10-25% of ISEs and SAs earned more than 50% of their compensation through commissions. These employees typically earned more than $100,000 per year. Some ISEs and SAs earned more than $200,000 per year. ISEs and SAs typically received more of their total compensation through commissions than SOAs did. (Bartlett Dec., ¶¶ 15-17; Schlendorf Dec., ¶¶ 14-16.)

- NMSRs received a base salary and commissions based on their team's ability to close sales in the new market. Since NMSRs were pioneering Zocdoc business, their commission structure varied from similar sales roles who were selling into stable, established markets. (Schlendorf Dec., ¶ 18.)

- SEs received a base salary and commissions based on the number of sales they closed. (Bartlett Dec., ¶ 18; Schlendorf Dec., ¶ 17.)

- Employees were compensated at increasingly higher base salaries to reflect increased responsibilities, different skill sets and increased experience. For example, SAs had a higher base salary than SOAs, SEs had a higher base salary than SAs, and ISEs had a higher base salary than SEs. (Bartlett Dec., ¶ 19; Schlendorf Dec., ¶ 19.)

The ADRs, AMs, and AAs in contrast, were Post-Sale Employees. (Schlendorf Dec., ¶ 21.) None of their duties involved pre-sale communications with customers, or originating customer sales or relationships:

- ADRs were post-sale employees who were responsible for contacting existing Zocdoc customers to generate additional business, such as upgrading customers on monthly contracts to yearly contracts, and enrolling additional doctors from a practice to join Zocdoc. (Schlendorf Dec., ¶ 22.)

- AMs were responsible for maintaining Zocdoc's existing customer relationships and preventing customer attrition. AMs' main role did not entail selling Zocdoc's products and services to existing customers. (Schlendorf Dec., ¶ 23.)

- AAs managed customer relationships, with an emphasis on preventing accounts from cancelling and renewing practice subscriptions. (Schlendorf Dec., ¶ 24.)

There was also significant variance in the way Zocdoc compensated Post-Sale Employees:

- ADRs received a base salary and commissions based on a percentage of the additional business they generated from existing customers. (Schlendorf Dec., ¶ 22.)

- AMs received a base salary and commissions based on (i) the number of customers retained within a given month, and (ii) their overall retention rate. (Schlendorf Dec., ¶ 23.)

- AAs received a base salary and commissions based on the number of doctors they retained from leaving the service. AAs who met their on-target earnings typically earned compensation through their base salary and less than 50% of their compensation through commissions. (Schlendorf Dec., ¶ 24.)

The job duties and pay provisions of the Proposed Collective thus varied widely, both between Pre-Sale and Post-Sale Employees, and among those respective groups. Pooling these nine different positions together for certification is not only improper under the relevant standard, but also completely impractical, as it would yield essentially nine or more mini-trials, unnecessarily complicate and expand discovery, and confuse the jury. *See, e.g., Diaz v. Electronics Boutique of Am., Inc.*, 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005) (denying conditional certification of a class of employees with the same job description because "their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of [the proposed class members'] duties is required"). The differing duties and pay structures among the Proposed Collective plainly establish that its members are not similarly situated, and thus cannot obtain conditional certification. *See, e.g., Callari*, 307 F.R.D. at 81–82; *Hendricks v. JPMorgan Chase Bank, N.A.*, 263 F.R.D. 78, 86 (D. Conn. 2009) (rejecting conditional certification where there were "differences between the substantive job responsibilities of potential class members"); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (factual differences among putative class members, including different payment structures, rendered conditional certification improper).

### b.     The Members of the Proposed Collective Are Subject to Different Exemptions Under the FLSA

The variance in job duties and compensation structures among the Proposed Collective predictably yields considerable differences in the applicability of FLSA exemptions among that group.  Employees who are subject to different exemptions under the FLSA cannot qualify as similarly situated for the purposes of conditional certification.  *Callari*, 307 F.R.D. at 81–82 (denying conditional certification of assistant branch managers and inside sales representatives where employees were subject to different exemptions); *Bearden v. AAA Auto Club S., Inc.*, 2013 WL 1181474, at *8 (W.D. Tenn. Mar. 18, 2013) (denying class certification where outside sales exemption applied to some members of the proposed class).  The variance in FLSA exemptions across the Proposed Collective thus provides another, independent bar to certification.

First, a significant number of the Proposed Collective qualify for the exemption under 29 U.S.C. § 207(i) ("Section 7(i)").  The Section 7(i) exemption provides that:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(i).  The Section exemption applies to retail or service sales employees who earn more than 50% of their total compensation through commissions.  *Id.*  That group includes sales employees who make sales over the phone.  *See, e.g., Parker v. NutriSystem, Inc.*, 620 F.3d

274, 284 (3d Cir. 2010) (call center sales employees were subject to the Section 7(i) exception where they earned commissions based on per unit sales).

The members of the Proposed Collective here were engaged in the telephonic sale of Zocdoc's products and services.  *See supra* at Section II.A.  Moreover, approximately 10% to 25% of the members earned more than 50% of their total compensation through commissions.  (Bartlett Dec., ¶ 16; Schlendorf Dec., ¶ 15.)  These employees are subject to the Section 7(i) exemption, and thus not similarly situated to the other members of the Proposed Collective.

While some members are subject to the Section 7(i) exemption, others are subject to the FLSA's exemption for highly-compensated employees.  That exemption applies to those employees (1) who earn total annual compensation of $100,000 or more; (2) whose primary duty includes performing office or non-manual work; and (3) who customarily and regularly perform at least one of the exempt duties or responsibilities of an exempt executive, administrative or professional employee.  29 C.F.R. § 541.601.  Approximately 10% to 25% of the Proposed Collective also earned total annual compensation of $100,000 or more, with some top performers earning over $200,000 per year.  (Bartlett Dec., ¶ 16; Schlendorf Dec., ¶ 15.)  These employees performed office work and performed certain administrative duties, such as performing work directly related to the management or general business of Zocdoc's customers.  *See supra* at Section II.A.; 29 C.F.R. §541.201.  These employees performed work directly related to the general business of Zocdoc's customers, assisted customers with selecting and using Zocdoc services and partially built customer profiles.  (Bartlett Dec., ¶ 13; Schlendorf Dec., ¶ 12.)

Still other employees are subject to different exemptions.  AMs are subject to the administrative exemption, as they provided expert advice and assistance to customers regarding Zocdoc's services, which is a form of marketing and thus directly related to customers' business

operations.  (Schlendorf Dec., ¶ 23.)  SEs, in contrast, were regularly engaged in outside sales away from Zocdoc's offices, and are thus subject to the outside sales exemption.  (Bartlett Dec., ¶ 18; Schlendorf Dec., ¶ 17); 29 U.S.C. § 213(a)(1).

This variance in exemptions among the Proposed Collective, especially considered alongside the variance in job duties and compensation structure, renders the collapse of Plaintiffs' Motion complete.  Indeed, such differences are not only appropriately considered on the Motion, but in fact necessitate its denial here.  *Guillen*, 2012 WL 2588771, at *1 (denying conditional certification where plaintiff failed to establish that the potential class members had similar job duties and were therefore subject to the same exemption analysis); *Callari*, 307 F.R.D. at 81–82 (noting that "conditionally certifying a collective action [is] inappropriate" where "differences between various [Assistant Branch Manager] descriptions of their job responsibilities and duties show that status under the FLSA may vary among plaintiffs and potential collective action members"); *Evancho v. Sanofi-Aventis U.S., Inc.*, 2007 WL 4546100, at *3 (D.N.J Dec. 19, 2007) ("Potential collective action members, thus, are not 'similarly situated' as to FLSA [exemption] status when that status may differ depending on their job responsibilities.").

## C.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR EQUITABLE TOLLING

In an FLSA collective action, the limitations period continues to run for each prospective plaintiff until he or she files a written consent to join the lawsuit with the court.  *See, e.g., Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014) (citing 29 U.S.C. § 256(b)).  While equitable tolling permits a court to extend a statute of limitations, the Supreme Court has made plain that federal courts should grant such tolling "sparingly."  *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).  Indeed, it is a "drastic remedy applicable only in rare and exceptional circumstances."  *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011)

(affirming denial of equitable tolling); *Apolinar*, 2016 WL 2903278, at *8 (noting that equitable tolling is premature in the absence of a showing that "a party has been prevented in some extraordinary way from exercising his rights"); *Vasto v. Credico (USA) LLC*, 2016 WL 2658172, at *16 (S.D.N.Y. May 5, 2016) (refusing to toll claims despite pendency of motion for conditional certification for seven months). To obtain equitable tolling, a plaintiff must show that "circumstances are so extraordinary that the doctrine should apply" and that the plaintiffs "acted with reasonable diligence." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003) (listing situations where equitable tolling is "generally considered appropriate," none of which are applicable here). Plaintiffs do not and cannot establish the extraordinary circumstances necessary to justify equitable tolling here.

A motion for conditional certification is part of the ordinary course of every FLSA collective action. Plaintiffs utterly fail to explain how this ordinary procedural step generates the type of extraordinary circumstances necessary to trigger equitable tolling. *Cf. Kassman v. KPMG LLP*, 2015 WL 5178400, at *4 (S.D.N.Y. Sept. 4, 2015) (equitable tolling appropriate where judicial shuffling caused extreme delays, which were "by no means part of the ordinary course of litigation"), reconsideration denied, 2015 WL 5775866 (S.D.N.Y. Oct. 2, 2015). Reserving equitable tolling for only those cases involving extraordinary circumstances comports with clear guidance from the Supreme Court and the Second Circuit that statutes of limitations cannot be disregarded as a matter of course, as Plaintiffs seek to do so here. Indeed, the Portal-to-Portal Act plainly provides that a plaintiff has not commenced an action until he or she has filed a written consent to join it. *See* 29 U.S.C. § 256.

Plaintiffs' citation to *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014), is inapposite. In *Jackson*, the court permitted equitable tolling where there was a nine-month delay

between plaintiff's motion for conditional certification and the court's ruling thereon. *Jackson*, 298 F.R.D. at 170. In explaining its reasoning, the Jackson court distinguished its ruling from that in *Mendoza v. Ashiya Sushi 5, Inc.*, 2013 WL 5211839, at *10 (S.D.N.Y. Sept. 16, 2013). In *Mendoza*, the court rejected an equitable tolling request where plaintiff's conditional certification motion was decided in less than three months. *Jackson*, 298 F.R.D. at 171. Nothing in *Jackson* – which is not remotely analogous here – suggests that the mere filing of a conditional certification is sufficient to justify equitable tolling, or that the Portal-to-Portal Act may be so easily disregarded. *See also Mendoza*, 2013 WL 5211839, at *10 (noting that equitable tolling for delay in deciding a motion is "[o]ften granted only when the delay is caused by "events external to consideration of the motion itself.") Zocdoc has a statutory right to be free of claims that are outside of the statute of limitations, and Plaintiffs' failure to demonstrate the extraordinary circumstances necessary to justify equitable tolling forecloses that drastic remedy here. *See Ramos v. Platt*, 2014 WL 3639194, at *4 (S.D.N.Y. July 23, 2014) (rejecting equitable tolling even where the defendant allegedly failed to post legally required notices).

**D.    SHOULD THE COURT GRANT CONDITIONAL CERTIFICATION, PLAINTIFFS' PROPOSED NOTICE SHOULD BE REJECTED**

In the event the Court grants any part of the Motion, the Court should direct the parties to meet and confer over the content and form of the notice and submit the same for Court approval. *See, e.g., Tamay v. Mr. Kabob Rest., Inc.*, 2016 WL 205456, at *2 (S.D.N.Y. Jan. 15, 2016) (directing parties to meet and confer over form and substance of notice). The parties should be afforded thirty days to negotiate an appropriate, accurate notice – a practice widely employed in FLSA collective actions, should notice be authorized (which it should not be). *See, e.g., Fengler v. Crouse Health Found., Inc.*, 595 F. Supp. 2d 189, 199 (N.D.N.Y. 2009). Should those efforts fail, Defendant proposes that opposing counsel cross-file proposed notice forms from which the

Court will determine an appropriate notice.  *See, e.g., Hinterberger*, 2009 WL 3464134, at *11-12 (W.D.N.Y. Oct. 21, 2009).  As it stands, Plaintiffs' proposed notice – which misspells lead Plaintiff's last name as "Alfaro" – suffers from several defects.  *See* Docket No. 53-15.

First, the notice should set forth the contact information for Defendant's counsel.  *See Limarvin v. Edo Rest. Corp.*, 2013 WL 371571, at *2 (S.D.N.Y. Jan. 31, 2013); *Hernandez v. Immortal Rise, Inc.*, 2012 WL 4369746, at *7 (E.D.N.Y. Sept. 24, 2012); *Diaz v. S&H Bondi's Dept. Store*, 2012 WL 137460, at *7 (S.D.N.Y. Jan. 18, 2012); *Moore v. Eagle Sanitation, Inc.*, 276 F.R.D. 54, 61 (E.D.N.Y. 2011).

Second, the notice should prominently indicate that putative collective members can choose their own counsel.  *See Calderon v. King Umberto, Inc.*, 892 F. Supp. 2d 456, 463 (E.D.N.Y. Sept. 25, 2012).

Third, Plaintiffs' request to mail, email, and text the notice is overbroad and unwarranted. As set forth below in Section E, Plaintiffs' request to text the notice necessarily requires Defendant's production of the Proposed Collective's telephone numbers, a needless intrusion into those individuals' privacy rights.

Finally, Plaintiffs' request for the issuance of a reminder notice should be denied.  Such notices "could potentially be interpreted as encouragement by the court to join the lawsuit." *Guzelgurgenli v. Prime Time Specials Inc.*, 883 F. Supp. 2d 340, 357 (E.D.N.Y. 2012) (quoting *Knispel v. Chrysler Grp. LLC*, 2012 WL 553722, at *8 (E.D. Mich. Feb. 21, 2012)).  As Plaintiffs have made no showing to justify use of a reminder notice here, their request should be denied.  *Id.*

## E.   SHOULD THE COURT GRANT CONDITIONAL CERTIFICATION, PLAINTIFFS' REQUEST FOR EMPLOYEES' TELEPHONE NUMBERS SHOULD BE REJECTED

Plaintiffs request that, in addition to conditionally certifying a class and approving Plaintiffs' proposed notice, the Court order Defendant to produce the last known telephone

numbers of each member of the Proposed Collective.  That request is overbroad and violates the putative plaintiffs' privacy rights.  Indeed, courts customarily deny requests for such information. *Han v. Sterling Nat'l Mortg. Co.*, 2011 WL 4344235, at *12 (E.D.N.Y. Sept. 14, 2011) (concluding that "plaintiff's request for Social Security and phone numbers is premature" because plaintiff had not presented any "evidence . . . that plaintiff will have trouble reaching the Proposed Class by sending the class notice to their address via first class mail. "); *Fengler v. Crouse Health Foundation, Inc.*, 595 F. Supp. 2d 189, 198 (N.D.N.Y. 2009) ("[W]here preliminary certification has been granted, defendants should be required to provide names and addresses of potential opt-in plaintiffs . . . however, given the present setting plaintiffs have no need for the additional, inherently private information sought, including . . .telephone numbers [and] social security numbers."); *Gordon v. Kaleida Health*, 2009 WL 3334784, at *11-12 (W.D.N.Y. Oct. 14, 2009) (in the interest of privacy, telephone numbers, social security numbers, and email addresses should not be produced); *Francis v. A&E Stores, Inc.*, No. 06 Civ. 1638, 2008 U.S. Dist. LEXIS 49971, at *8-9 (S.D.N.Y. Jun. 26, 2008) (approving the production of the names and addresses of individuals while rejecting plaintiffs' request for social security numbers, telephone numbers, and dates and location of employment); *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 324 (S.D.N.Y. 2007) (defendant should not provide private information such as telephone numbers and social security numbers for notification purposes).  As such, Plaintiffs' request should be denied here.

## IV. <u>CONCLUSION</u>

For all the reasons discussed herein, the Court should deny Plaintiffs' Motion for Conditional Collective Certification.

25

Dated:  June 29, 2018                OGLETREE, DEAKINS, NASH, SMOAK
New York, New York           & STEWART, P.C.

By: *s/ Frank Birchfield*
    Frank Birchfield
    Evan B. Citron
1745 Broadway, 22nd Floor
New York, NY 10019
(212) 492-2500
frank.birchfield@ogletreedeakins.com
evan.citron@ogletreedeakins.com

*Attorneys for Defendant*
*Zocdoc, Inc.*

26