UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
MARGARET ALFANO, on behalf of herself and all :
others similarly situated, and SHAAN KASTUAR, :
individually, :
:
                    Plaintiff,      :    18-cv-02558-LTS-OTW
:
               -against-      :    **DECLARATION OF**
                                                    :    **PETER SCHLENDORF**
ZOCDOC, INC., :
:
               Defendant. :
---------------------------------------------------------------- x

     I, PETER SCHLENDORF, hereby declare and state as follows:

     1.     I am the Senior Director of Sales Operations at Zocdoc, Inc. ("Zocdoc"), and work at Zocdoc's offices in New York, New York. I began working for Zocdoc as a Sales Operations and Strategy Manager in June 2013. As such, the facts stated below are true and of my own personal knowledge. If called as a witness to testify to these facts, I could do so competently.

     2.     Zocdoc is an online medical care appointment booking service that provides patients with the ability to, among other things, find and schedule appointments with in-network health care providers. Zocdoc's services are free of charge for patients, while providers pay subscription fees to be included on Zocdoc's online platform.

     3.     Zocdoc maintains United States offices in Scottsdale, Arizona and New York, New York (the "NY Office").

     4.     Zocdoc's sales operations team is responsible for designing commission plans, performance management, policy creation and enforcement, and engagement policies.

5. In November 2015 and April 2016, Zocdoc underwent a number of organizational restructurings. For purposes of this Declaration, I will address Zocdoc's organizational structure and policies as they existed between October 2013 and November 2015.

6. During the relevant period, Zocdoc sold subscription plans to providers and practices that included marketing, promotion, and advertising services.

7. Zocdoc is not a software company. Although it creates technical solutions for practices or health systems clients (e.g., a "widget" or online plugin allows practices who are customers of Zocdoc to easily integrate Zocdoc's online booking into their website), it does not and never has sold hosted software.

8. From March 2015 to November 2015, Zocdoc's sales employees included, among other positions, employees responsible for communicating with providers prior to their purchase of Zocdoc services ("Pre-Sale Employees"), and (ii) employees responsible for communicating with providers subsequent to their purchase of Zocdoc services ("Post-Sale Employees").

9. Zocdoc's Pre-Sale Employees included Sales Origination Associates (formerly called Business Origination Associates) ("SOAs"), Inside Sales Executives ("ISEs"), Sales Associates ("SAs"), New Market Sales Representatives ("NMSRs"), and Sales Executives ("SEs"). Each of these positions entailed different duties and compensation structures.

10. SOAs were junior-level employees responsible for "cold-calling" potential customers to schedule meetings between the potential customers and ISEs and SAs. SOAs were not involved in closing sales, and performed their duties at Zocdoc's offices.

11. SOAs received a base salary and commissions based on how many meetings they were able to set up with potential customers, and the business that resulted from any such meetings.

Unlike ISEs and SAs, SOAs typically received less than 50% of their total compensation through commissions.

12.     ISEs and SAs were responsible for selling Zocdoc's products and services to potential customers, closing sales, assisting customers with selecting services, and partially building customer profiles. ISEs and SAs also commonly assisted customers with their use of Zocdoc's services, and researched healthcare practices to assess their fitness for inclusion among Zocdoc's services.

13.     ISEs and SAs received referrals from SOAs, and "cold-called" potential customers. They scheduled meetings with potential customers, and led customer meetings that SOAs scheduled. ISEs and SAs performed certain of their duties at Zocdoc's offices, and certain of their duties away from Zocdoc's offices.

14.     While ISEs received a base salary and commissions based on the number of sales they closed, ISEs received a higher base salary than SAs. SAs received a higher base salary than SOAs. When meeting their on-target earnings, ISEs typically earned approximately 50% of their compensation through their base salary and 50% of their compensation through commissions.

15.     Approximately 10-25% of ISEs and SAs earned more than 50% of their compensation through commissions. These employees typically earned more than $100,000 per year. Some ISEs and SAs earned more than $200,000 per year.

16.     SAs were junior-level ISEs whose job duties and compensation structure mirrored that of ISEs. ISEs, NMSRs and SAs received more of their total compensation through commissions than SOAs did.

17.     SEs were responsible for outside sales, which entailed selling Zocdoc's services through visits to the offices of potential customers. SEs regularly performed their duties away

from Zocdoc's offices. Standard SE duties included "cold calling" prospects in their assigned territory, and setting up meetings with providers or practices, building a professional profile for the provider or practice, meeting with the practice's staff, and scheduling training/onboarding of the practice to ensure a successful, long-term relationship with Zocdoc. SEs received a base salary and commissions based on the number of sales they closed. The SE base salary was higher than the SA base salary, but lower than the ISE base salary.

18. Zocdoc no longer has NMSRs. During the relevant period, New Market teams consisted of inside salespersons (typically ISEs and SAs) who were assigned to specific territories where Zocdoc had little to no presence and/or existing clients. Since NMSRs were pioneering Zocdoc business, their commission structure varied from similar sales roles who were selling into stable, established markets. Unlike other positions which based commission solely on individual sales, NMSR compensation was a combination of a base salary and a commission based on the team's collective ability to close sales in the new market. Additionally, New Market teams had the potential to earn a bonus for achieving collective sales goals.

19. There was considerable variance among the salaries of the Pre-Sale Employee positions. Indeed, employees were compensated at increasingly higher base salaries to reflect increased responsibilities, different skill sets and increased experience. For example, SAs had a higher base salary than SOAs, SEs had a higher base salary than SAs, and ISEs had a higher base salary than SEs. SAs had a higher base salary than SOAs, and SEs and ISEs had a higher base salary than SAs.

20. Each Pre-Sale Employee position also reflected a combination of employee ambition, qualifications, and skills. For instance, employees who were successful in sales but demonstrated less customer service skills might ascend to ISE rather than AM.

21.     Zocdoc's Post-Sale Employees included Account Development Representatives ("ADRs"), Account Managers ("AMs"), and Account Associates ("AAs").

22.     ADRs were post-sale employees who were responsible for contacting existing Zocdoc customers to generate additional business, such as upgrading customers on monthly contracts to yearly contracts, and enrolling additional doctors from a practice to join Zocdoc. ADRs received a base salary and commissions based on a percentage of the additional business they generated from existing customers.

23.     AMs were responsible for maintaining Zocdoc's existing customer relationships and preventing customer attrition via, among other things, providing expert advice and assistance to customers regarding Zocdoc's services. AMs' main role did not entail selling Zocdoc's products and services to existing customers. AMs received salaries and commissions based on (i) the number of customers retained within a given month, and (ii) their overall retention rate.

24.     AAs managed customer relationships, with an emphasis on preventing accounts from cancelling and renewing practice subscriptions. AAs received a base salary and commissions based on the number of doctors they retained from leaving the service. Typically, AAs were recruited from strong performing Zocdoc employees who were recommended by their current manager. AAs who met their on-target earnings typically earned compensation through their base salary and less than 50% of their compensation through commissions.

25.     At certain times, the calculation of a sales employee's commissions was based not only on that employee's position, but also on his or her assigned sales territory. Zocdoc occasionally factored an employee's territory into his or her commission calculation because closing business proved more challenging in some territories than in others. Accordingly, sales

employees who worked in more difficult territories occasionally received higher commissions on a per doctor basis than employees who worked in less difficult territories.

26. Additionally, employees' work schedules may be adjusted by their manager depending on the assigned sales territory (*e.g.*, managers frequently permitted sales employees to arrive an hour later or an hour earlier corresponding to the business hours of their teams' assigned territory). As sales employee shifts were frequently scheduled or altered based on regional time zones and targets, employees did not uniformly work from 9:00 a.m. to 5:00 p.m.

27. Zocdoc's sales employees performed their duties as part of teams. While SOAs were generally assigned to teams of fifteen to twenty employees, Zocdoc's other sales employees were assigned to teams of five to twenty employees. Zocdoc assigned a supervisor to each team, and each supervisor possessed a significant degree of autonomy to set the team's goals, rules, and regular work hours. Team goals, rules, and regular work hours thus varied greatly depending on the team's supervisor. Some supervisors, for example, set fixed working schedules for their teams, while others permitted team members to determine their own arrival and departure times. No supervisor, however, instituted a rule or schedule that required employees to work more than forty hours per week. Nor did any Zocdoc policy require employees to work more than forty hours per week, or indirectly compel that result.

28. Upon information and belief, prior to November 2015, Zocdoc sales goals were achievable within the work week. Like with many sales positions, success depended on a number of factors, including employee initiative and opportunity. Some top performers were able to exceed their sales goals while working less than forty hours per week.

29. The hours that employees worked, along with a broad range of relevant sales data, including client leads, performance metrics, and employees' daily activities, were reflected in

SalesForce, a customer relationship management platform that sales teams used to track key data and maximize performance.

30. While employees in the NY Office were not required to work more than forty hours per week, some sales employees elected to do so to earn higher commissions. Those employees usually produced more and typically earned well in excess of $100,000 per year in total compensation.

31. Zocdoc provided all employees with a catered lunch every Monday through Friday, except for holidays. Upon information and belief, prior to November 2015, Zocdoc's sales employees took lunch breaks of thirty minutes to one hour for lunch every day.

32. Additionally, Zocdoc has a fun room in the NY Office that includes free snacks, ping pong tables and arcade games. During the relevant period, Zocdoc's sales employees frequently took unscheduled breaks during the day to enjoy these amenities, in addition to their lunch breaks.

I declare under penalty of perjury under the laws of the United States of America that the facts stated above are true and correct.

Executed this 29th day of June, 2018, at New York, New York.

*[signature]*

Peter Schlendorf